### ALKSNE v. UNITED STATES. *
### No. 2401.

Circuit Court of Appeals, First Circuit.
March 5, 1930.

William H. Lewis, of Boston, Mass. (Matthew L. McGrath, of Boston, Mass., on the brief), for appellant.

Ellen L. Buckley, Asst. U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., and Hubert C. Thompson, Asst. U. S. Atty., of Boston, Mass., on the brief), for the United States.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

WILSON, Circuit Judge.

An appeal from the decision of the District Court ordering the forfeiture of the vessel Cretan, and her cargo consisting of 787 drums containing 82,635 gallons of alcohol, 15 bottles of assorted liquors, and 500 bales of waste paper. The essential facts are as follows: One Carl Pustau of New York in June, 1926, purchased the Cretan, which was formerly a passenger steamer; and on June 4, 1926, enrolled her at Balti-more and obtained a license to engage in coastwise trade. August Alksne was named as master. She was at once chartered by the Atlas Chartering Company of New York. On June 15, 1926, she was at Portland, Me., where she took on a cargo of Portland cement, which she unloaded at Philadelphia. From this port she sailed light for Boston, arriving on June 29th.

Some time prior to her arrival in Boston, Pustau had engaged the services of one Thomas F. Smith to act at Boston as agent of the Cretan for Pustau and the Atlas Chartering Company. After her arrival one Edwin Rogers was introduced to Smith by Pustau as the marine superintendent of the Atlas Chartering Company.

Acting under instructions from Pustau, Smith received at Battery Wharf in Boston, some time prior to June 29th, 800 bales of waste paper, which were to be consigned to the National Paper Company in Philadelphia. Pustau gave Smith specified instructions as to how the paper was to be loaded on the Cretan, i. e., between decks, leaving the square of the hatches of the lower hold free, and to load nothing in the lower hold. Upon her arrival in Boston on June 29th, stevedores began loading the waste paper in accordance with these instructions.

On July 1st, Smith, on instructions from Pustau, ordered the stevedores to stop loading when only 500 bales had been loaded. On July 1st the captain, presumably Alksne, though there is some confusion in the testimony as to who the actual master was, presented to the deputy collector of customs at Boston a manifest dated July 1, 1926, stating that the Cretan was bound from Boston to Philadelphia via Portland with a cargo of 500/800 bales of waste paper. A permit to sail was issued.

The Cretan sailed from Boston on July 2d to a point on the high seas northeast of Cape Cod, where, early in the morning of July 3d, she met and tied up alongside a vessel, the name of which is unknown, but from the evidence apparently of foreign origin. From this vessel the Cretan received on board the 787 drums of alcohol and the assorted liquors, which were appraised in Boston at the domestic value of $368,958.23.

The Cretan and the unknown vessel were alongside about twenty-four hours, when the Cretan cast off and proceeded in the direction of Philadelphia. When she had reached a point ten miles south of Nantucket lightship, the radio operator on board received about noon of the following day a radio mes-

sage which, according to the best recollection of the operator, stated that there was "boiler trouble in Philadelphia," and to proceed to Boston to take on the rest of the paper.

This somewhat cryptic message resulted in a conference between the captain, the radio operator, the captain's clerk, and Rogers, the marine superintendent of the chartering company, who was on board in the capacity of supercargo. As a result it was decided to return to Boston as suggested in the message. The ship was put about and arrived in Boston on July 6th about 6:30 p. m.

On the morning of the 7th the agent, Smith, received a call by telephone from Pustau, in consequence of which Smith ordered stevedores to load on the balance of the waste paper. Smith at the captain's request furnished the vessel with some food and ice and tools for the engine room, consisting of a set of tube expanders, a beading iron, and an oyster knife. No other tools were requested or furnished.

The deputy collector on the morning of the 7th, noting from the report of entries in that port on the previous day as published in the morning paper, that the Cretan had returned, and knowing that sufficient time had not elapsed to enable her to sail to Philadelphia via Portland and return, sent a customs inspector with two other assistants down to board her and ascertain the reason for her return.

On going on board about 10 o'clock a. m. on the 7th, the captain on request exhibited his manifest to the customs inspector, as he did also to the deputy collector, who boarded her for further investigation in the afternoon. The manifest disclosed as cargo only the 500/800 bales of waste paper taken on before leaving Boston; nor did the captain declare at either visit that he had taken on any more cargo.

On examination of the vessel, with the consent of the captain, the customs inspector detected an odor of alcohol in the hold of the ship and reported back to the deputy collector, who in the afternoon went on board with the customs inspector and ordered the stevedores to unload some of the waste paper so that the lower hold could be inspected, which disclosed the alcohol and liquors. Whereupon the vessel and her cargo were seized by the customs officials and her papers delivered over by the captain, including her manifest, license, bill of sale, copy of charter, shipping articles, and log. There was among her papers no permit for the importation of alcohol and liquors into the Unit-ed States from the Commissioner of Internal Revenue; nor was such a permit delivered to the deputy collector by the captain, nor any claim made by the captain or the supercargo that such a permit had been obtained or applied for. An examination of the Custom House files at Boston disclosed no record of any entry of alcohol and assorted liquors imported on the Cretan on July 6, 1926.

The vessel and cargo were placed in charge of the United States Marshal, and, upon a libel brought by the United States Attorney for the district of Massachusetts, were ordered forfeited and sold.

The libel alleges, as grounds of forfeiture, that the vessel and cargo were seized by the deputy collector as forfeited to the United States for violation of the laws of the United States, and specifying in the following particulars: (1) That said vessel had, during the period from June 4th to July 7th, at Boston and divers other places unknown to the libelant, unlawfully engaged in a trade other than that for which she was licensed, and by virtue of section 4377 of the Revised Statutes of the United States (46 USCA § 325) the vessel and cargo became liable to forfeiture; (2) that said liquors were unlawfully possessed on board the Cretan by August Alksne, master, and by other persons to the libelant unknown, with intent to violate title 2 of the National Prohibition Act (27 USCA § 4 et seq.) by unlawfully importing said liquors without a permit from the Commissioner of Internal Revenue; (3) that certain articles of merchandise from a foreign country were unlawfully and knowingly imported and brought into the United States concealed on board the Cretan and were forfeitable under title 1, Schedule 8, par. 813, and title 4, § 593(b) of the Tariff Act of 1922 (19 USCA §§ 121, 497).

The court below, while three grounds of forfeiture were alleged, ordered the vessel and cargo forfeited under section 4377 of the Revised Statutes of the United States (46 USCA § 325) on the ground that she was engaged in a trade other than that for which she was licensed.

The court also made the following findings and rulings requested by the government which bear on the ground on which the court ordered the vessel and cargo forfeited:

That the Cretan came into Boston with her cargo of alcohol and assorted liquors voluntarily, and not because she was unseaworthy.

That the assorted liquors found on the Cretan contained one-half of 1 per cent. or more of alcohol by volume and were fit for beverage purposes.

That the alcohol found on the Cretan was fit for beverage purposes.

That the alcohol and assorted liquors found on the Cretan were imported for beverage purposes.

That the alcohol was concealed in the hold of the Cretan under a cargo of waste paper.

That the alcohol and assorted liquors found on board the Cretan were subject to customs duties which had not been paid or secured to be paid.

That the alcohol and assorted liquors found on the Cretan were subject to internal revenue taxes which were not paid or secured to be paid.

That the alcohol and assorted liquors were possessed on board the Cretan at Boston with the intent on the part of the persons in possession to import them in violation of title 2 of the National Prohibition Act (27 USCA § 4 et seq.).

That the Cretan was engaged in an unlawful trade.

That the Cretan was engaged in a trade other than that for which licensed.

That the Cretan and the cargo of alcohol and assorted liquors are subject to forfeiture to the United States under section 4377 of the Revised Statutes of the United States (46 USCA § 325).

That the boarding and search of the steamship Cretan in Boston Harbor on July 7, 1926, by customs officers was lawful.

Other facts were found and other rulings made which were assigned as errors, but as to whether they were correct rulings is not material, as the above were warranted from the evidence and constituted a sufficient ground for the order of the forfeiture under section 4377, Rev. St. (46 USCA § 325).

The appellant specified some eighteen erroneous rulings in his assignment of errors, but waives all except the following:

(1) That the court erred in sustaining the libel against the vessel and cargo under Rev. St. § 4377 (46 USCA § 325), and in connection therewith erred in refusing to rule that, under section 4351, Rev. St. (title 46, § 296, USCA), the Cretan had a right to carry intoxicating liquors providing before landing the same she presented a manifest to the customs officials.

(2) That the court erred in ruling that the cargo was subject to forfeiture under title 1, Schedule 8, par. 813, and title 4, § 593(b) of the Tariff Act of 1922 (19 USCA §§ 121, 497).

(3) That the court erred in ruling that the cargo was forfeitable under title 2, §§ 3 and 25, of the National Prohibition Act (27 USCA §§ 12, 39), and in connection therewith that the alcohol was imported for beverage purposes, and fit for beverage purposes.

(4) That the court erred in refusing to rule that the circumstances under which the vessel and cargo were seized came within the purview of section 26, title 2, of the National Prohibition Act (27 USCA § 40), and that it was mandatory for the United States to proceed under that act.

(5) That the court erred in overruling the motion to suppress the evidence and refusing to rule that the search and seizure of the vessel was in violation of the claimant's rights under the Fourth and Fifth Amendments of the Constitution.

(6) That the court erred in refusing to rule that at the time of seizure of said steamship Cretan and cargo the vessel came into the collection district and port of Boston in distress by reason of damage to her boilers, engines, and hull.

(7) That the court erred in admitting the indictment against the captain and crew and other persons connected with the steamship Cretan for conspiracy to violate the Tariff and National Prohibition Acts.

The appellant's first assignment of errors on which he relies is that the court erred in sustaining the libel against the vessel and cargo under Rev. St. § 4377 (section 325, title 46, USCA), the material part of which reads as follows: "Whenever any licensed vessel * * * is employed in any other trade than that for which she is licensed * * * such vessel with her tackle, apparel, and furniture, and the cargo, found on board her, shall be forfeited."

Before considering this point, which is the main issue in the case, it may be well to dispose of some of the other objections raised by counsel, which, if the alleged breach of her license is sustained, are either immaterial or have no merit and only tend to becloud the main issue.

Whether the cargo was subject to forfeiture under paragraph 813 and 593(b) of the Tariff Act of 1922 (19 USCA

§§ 121, 497) is immaterial, since, even if there was error in so ruling, it could not harm the appellant, provided the vessel and cargo were subject to forfeiture on the ground on which the court below based its order.

For the same reason, if there had been error, which we do not hold, in ruling that the vessel and cargo were forfeitable under title 2, §§ 3 and 25, of the National Prohibition Act (27 USCA §§ 12, 39), it was equally harmless, if she was forfeitable under section 4377 of the Revised Statutes (46 USCA § 325).

There is no merit in the contention that the circumstances under which the vessel and cargo were seized came within the purview of section 26 of title 2 of the National Prohibition Act (27 USCA § 40), and that it was therefore mandatory for the government to proceed to forfeit under that act.

The Cretan and her cargo were not seized while in the act of transporting liquors, but while she was tied up at the wharf taking on cargo; nor were the officers, supercargo, and men indicted for transporting liquors under section 26 of the act (27 USCA § 40), but for conspiracy to violate section 593(a) and (b) of the Tariff Act of 1922 (19 USCA §§ 496, 497), and section 3 of the National Prohibition Act (27 USCA § 12). Since the government did not proceed under section 26 of the National Prohibition Act (27 USCA § 40), in making the seizure, nor in prosecuting those engaged in violating the law, it was at liberty to invoke forfeiture under section 4377, Rev. St. (46 USCA § 325). United States v. One Ford Coupe, 272 U. S. 321, 47 S. Ct. 154, 71 L. Ed. 279, 47 A. L. R. 1025; Port Gardner Investment Co. v. United States, 272 U. S. 564, 47 S. Ct. 165, 71 L. Ed. 412; Commercial Credit Co. v. United States, 276 U. S. 226, 48 S. Ct. 232, 72 L. Ed. 541; National Surety Co. v. United States (C. C. A.) 17 F.(2d) 372.

Neither is there any merit to the contention that there was error because the court below refused to rule that under section 4351, Rev. St. (title 46, § 296, USCA) the Cretan had a right to carry intoxicating liquors, provided before landing the same she presented a manifest declaring such liquors to the customs officials.

Such a ruling would have been without any application to the facts in the case as found by the court below.

If there had been any evidence at all that those in charge of the vessel and cargo were importing the liquors for a lawful purpose, under a permit from the Commissioner of Internal Revenue, with intent to pay the customs duties and revenue taxes, and had any intention of presenting a manifest to the customs officer in charge of the port of landing, such a ruling would have been proper; but upon the evidence in this case clearly indicating only a contrary and unlawful intent, it would have served no purpose to rule that she had a right to carry intoxicating liquors, if before landing she complied with sections 4351 or 4355, Rev. St. (46 USCA §§ 296, 300), especially since she could not land them without master or owners of the cargo also complying with section 3 of the Prohibition Act (27 USCA § 12). The refusal to so rule, therefore, could not harm the appellant.

What determines the rights of the claimant is not what the vessel might have done, but what she was doing. No one could seriously contend that the Cretan when she left Boston on July 2, 1926, or in returning to Boston on July 6th, was bound on any lawful voyage.

The method of obtaining her crew, the character of her cargo taken on at Boston, the manner of its loading under direction of her owner, the false statement as to her destination, the proceeding directly to the point where she met the foreign vessel from which she took on the large quantity of intoxicating liquors, and the manner in which they were concealed—clearly indicating the purpose of the method of loading the waste paper at Boston—the proceeding toward Philadelphia and the receipt of the cryptic message concerning *"boiler trouble at Philadelphia,"* coupled with an order to return to Boston and take on the remainder of the waste paper, the failure to report the cargo of liquor taken on when the customs officers came to inspect the vessel, puts the question of unlawful intent beyond the limits of intelligent or serious discussion.

That she might have transported liquor outside of the three or twelve mile limits under her license with lawful intent is beside the point. She was not engaged in any such lawful enterprise. The court below so found, and the evidence permitted no other finding.

In coming into the port of Boston on July 6th in compliance with the radio message, she entered voluntarily with a cargo of intoxicating liquors concealed on board. Since the court was warranted in finding that it was the intent of those in charge of her

to bring the liquors into the United States without a permit from the Commissioner of Internal Revenue, and that they were intended for an unlawful use, in so doing she was not only violating section 26 of title 2 of the National Prohibition Act (27 USCA § 40) in transporting liquors within the territorial jurisdiction of the United States, but section 3 of the act (27 USCA § 12), as well, by importing liquors contrary to the provisions of the Eighteenth Amendment and of the act. By the Eighteenth Amendment and the National Prohibition Act importing is prohibited into all territories subject to the jurisdiction of the United States. The term "importation" has a broader meaning, both in the amendment and in the act, than in the customs revenue laws. Under the former the bringing of intoxicating liquors intended for beverage purposes within the three-mile limit, though without an intent to land, is not only forbidden transportation, but forbidden importation. Cunard v. Mellon, 262 U. S. 100, 120–122, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306.

■ The fact that the vessel was engaged in an unlawful trade being found by the court below, and upon evidence which established it beyond peradventure, she became liable to forfeiture under section 4377 of the Revised Statutes of the United States (46 USCA § 325) for engaging in a trade other than that for which she was licensed.

It has been held from the earliest times that a license for a coastwise trade only authorized the carrying on of a lawful trade, and an engagement in any unlawful trade forfeited all protection under such a license and rendered the vessel and her cargo liable to forfeiture. In United States v. The Mars, Fed. Cas. No. 15,723 (1812), Judge Story in his opinion says: "As to the second count, the principal difficulty is to decide, whether the circumstances of the case present a legal presumption of prohibited traffic. For I hold it a salutary doctrine, that if a coasting vessel be engaged in illegal trade, she is to be considered as employed in a trade, other than that for which she is licensed, and of course forfeits the protection of her license."

Again, in The Resolution, Fed. Cas. No. 11,709, a case of smuggling, in which Judge Story again lays down the same rule: "A vessel licensed for the coasting trade cannot, without manifest absurdity, be supposed to be authorized thereby to carry on an illegal traffic. Such a construction would overturn the whole revenue system. * * * It is very clear, that a coasting vessel engaged in an illegal traffic, is employed in a trade, other than that, for which she is licensed, and consequently liable to condemnation."

Also see The Two Friends, Fed. Cas. No. 14,289; The Sloop Active v. United States, 7 Cranch, 100, 3 L. Ed. 282.

And coming down to recent times, since the enactment of the National Prohibition Act (27 USCA), this court and the Circuit Courts in the other circuits have repeatedly held that the violation of that Act rendered a vessel liable to forfeiture under section 4377, Rev. St. (46 USCA § 325), as being engaged in a trade other than that for which she was licensed.

In The Esther M. Rendle (C. C. A.) 7 F.(2d) 545, 547, the court following the earlier cases said: "Although the tug was licensed to engage in coastwise trade, its employment in illegal trade or traffic, whether coastwise or foreign, would subject it to forfeiture under Rev. St. § 4377 (46 USCA § 325), as being employed in trade other 'than that for which she is licensed.'" When this case again came before the court on an amended libel (C. C. A.) 13 F.(2d) 839, the court followed the same rule and ordered the vessel forfeited.

The Rosalie M. (C. C. A.) 12 F.(2d) 970; The Underwriter (C. C. A.) 13 F.(2d) 433, 435, affirmed 274 U. S. 501, 47 S. Ct. 735, 71 L. Ed. 1171 (under title Maul v. United States); The Mineola (C. C. A.) 16 F.(2d) 844; The Dewdrop (C. C. A.) 30 F. (2d) 394, were all forfeited upon the same grounds. In the case of The Underwriter, when heard in the Supreme Court, while the issue there was on another point, it was not suggested by counsel or court that the vessel was not liable to forfeiture under section 4377, Rev. St. (46 USCA § 325).

The Przemysl (D. C.) 23 F.(2d) 336, cited by counsel for the appellant, is not in point. The libel for forfeiture in that case was based on the customs statutes, and the case merely holds that importing under the customs act means the bringing into a port of entry with intent to land for fusion with the commerce of the country, and under the facts in that case the vessel and cargo were not forfeitable on the grounds alleged in the libel. The court in its opinion, however, recognized the distinction pointed out in Cunard v. Mellon, 262 U. S. 100, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306, between importing under the National Prohibition Act and under the customs acts.

■ The manner in which the liquors were obtained and transported and the circum-

stances attending their loading and concealment in the vessel clearly warranted the finding of the judge below that they were intended for beverage purposes. Brown v. United States (C. C. A.) 16 F.(2d) 682, 684.

There is no contention that the assorted liquors were not fit for beverage purposes; but it is contended that the alcohol, being 95 per cent. proof by volume, was too strong for the average person to drink without dilution, and at its full strength constituted a poison, and therefore was not fit for beverage purposes.

The National Prohibition Act (27 USCA § 4) defines intoxicating liquors as alcohol, whisky, gin, rum, etc., and "any [other] spirituous, vinous, malt or fermented liquor, liquids, and compounds * * * containing one-half of 1 per centum or more of alcohol by volume which are fit * * * for beverage purposes."

 Alcohol scientifically may be classified as a poison, but that does not interfere with its being an intoxicating liquor. It is the basic element of all intoxicants. Indeed it is its poisonous effects which renders it intoxicating, as that word itself implies. It is common knowledge, and the act so declares, that alcohol, whisky, rum, etc., are intoxicating. To be intoxicating, however, they must be used as a beverage. The act itself, therefore, assumes that these liquors are fit for beverage purposes; and the courts have frequently held that it is not necessary to allege or prove that alcohol, whisky, gin, etc., are either intoxicating or fit for beverage purposes. Strada v. United States (C. C. A.) 281 F. 143; Hensberg v. United States (C. C. A.) 288 F. 370; Weinstein v. United States (C. C. A.) 11 F.(2d) 505, 509; United States v. McGuire (D. C.) 300 F. 98, 100. That only the most hardened toper would use 95 per cent. proof alcohol without dilution, or that in terms of science it is classified as a poison, does not render it unfit for beverage purposes within the meaning of the Prohibition Act.

 The phrase, "fit for beverage purposes," found in section 1, tit. 2, of the act (27 USCA § 4), was intended, we think, by Congress to be limited in its modification to the items enumerated after the words "in addition thereto"; and that it is the common understanding, and was the intent of Congress so to declare, that alcohol, whisky, rum, etc., are all intoxicating liquors, and therefore are to be considered fit for beverage purposes within the meaning of the act, unless rendered unfit by the addition of some other ingredient for that purpose. If it should be held that pure alcohol of high proof is not an intoxicating liquor by reason of its being unfit for beverage purposes without dilution, the fraternity known as "bootleggers" can hereafter ply their trade with impunity.

 There was no error in the court below refusing to suppress any evidence obtained on the seizure upon the ground that the seizure was illegal, and therefore evidence so obtained was in violation of the Fourth and Fifth Amendments of the Constitution.

The customs officers under section 581, tit. 4, of the Tariff Act of 1922 (USCA title 19, § 481), are authorized to board any vessel *at any place* in the United States, examine the manifest, inspect and search the vessel, and, if it shall appear that *any breach or violation* (italics ours) of the laws of the United States has been committed whereby the vessel or any merchandise on board is liable to forfeiture, it shall be the duty of such officer to seize the same.

Again: "The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. * * * In the one case, the government is entitled to the possession of the property; in the other it is not." Boyd v. United States, 116 U. S. 616, 623, 6 S. Ct. 524, 528, 29 L. Ed. 746; Carroll v. United States, 267 U. S. 132, 149, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790.

 Neither is there merit in the contention that admitting the indictment and pleas of guilty of the owner of the vessel, of the secretary of the chartering company and supercargo, and some of the seamen, to the conspiracy charge for violating, not only the National Prohibition Act, but also the revenue laws, was prejudicial error. The pleas of guilty by Pustau, the owner, and by Rogers, the supercargo and agent of the charterer, and of the seamen, all of whom must have known of the use being made of the Cretan, were clearly evidence against the vessel; and even though Alksne, who claimed merely as bailee for the owners, could complain of its being admitted as to the cargo, the case was heard by a judge without a jury. In such case the reception of inadmissible evidence is not reversible error, where there is abundant evidence otherwise to sustain the conclusions of the sitting justice, as there

was in this case. Cascaden v. O'Connor (C. C. A.) 257 F. 930; Streeter v. Sanitary Dist. of Chicago (C. C. A.) 133 F. 124; Mining Co. v. Taylor, 100 U. S. 37, 25 L. Ed. 541; and inasmuch as the claimant made no request for a ruling that, even if admissible as to the vessel, such evidence was res inter alios as to the owner or owners of the cargo, he cannot now complain in this court.

 Neither was there error in refusing to find that the Cretan at the time of her seizure had come into the port of Boston in distress by reason of damage to her engines and hull. The court found otherwise, and we think upon a preponderance of the evidence. To furnish a defense against forfeiture in such a case, if it is a defense, the necessity for violation of law must be urgent and the proof clear. The New York, 3 Wheat. 59, 4 L. Ed. 333.

Claimant relies chiefly on the testimony of the engineer, whose deposition was taken, to the effect that by reason of a defect in the condenser pipe and an injury to the bottom blow valve and a valve in one of the feed pumps, all of which resulted in taking in water and the blowing of some of the boiler tubes; that on the way out they had drifted two or three days because of these defects, and that it was at his request that the captain returned to Boston because the witness informed the captain it was dangerous to proceed; and on the testimony of some of the officers placed in charge that she leaked quite badly while at the wharf in Boston. Against this testimony, however, was the testimony of the engineer, previously in charge of the Cretan, that her boilers and engines were in pretty good or fair condition when she was transferred the 1st of June, the testimony of government inspectors, that the difficulties with the pumps and condenser and tubes could have been readily repaired at sea and the vessel continued on her voyage with safety, and especially the testimony of the radio operator on board that the boat did not lay to or drift for any period after leaving Boston, and that the reason for the return to Boston was the receipt of the radio message advising them to return, and of "boiler trouble in Philadelphia." Whatever the radio message really meant to the master, it very likely suggested the idea of actual boiler trouble as the only excuse which could be given for their return. The ship's log, however, registered that she made full speed in returning, as the elapsed time also indicated. On arriving in Boston, it is significant that the only preparation for repairs to render her seaworthy was a request for some packing, a set of tube expanders, a beading iron, and an oyster knife. The agent, however, acting on orders from Pustau, proceeded to load the remainder of the waste paper and understood she was to sail again as soon as loaded. Certainly the finding upon this evidence that she returned to Boston voluntarily and in compliance with the radio message does not constitute reversible error.

It is also suggested by counsel in argument that, if forfeited under section 4377 (46 USCA § 325), section 4378, Rev. St. (46 USCA § 326) should be given effect and the cargo saved from forfeiture. Section 4378, however, has no application unless the duties on the cargo have been paid or secured. The claimant here does not appear as owner, and no evidence was offered that the cargo belonged in good faith to any one other than the master, the owner or charterer, nor did any such owners appear. In any event we think this section does not apply to owners who are also participants in the unlawful trade in which the vessel was engaged at the time of seizure, as the owner or owners of these liquors, whoever they are, must have been.

The decree of the District Court is affirmed.

ANDERSON, Circuit Judge, concurs in the result

*Certiorari denied 50 S. Ct. 464, 74 L. Ed. ——.