## THE MAZEL TOV.

## UNITED STATES v. COOK.

### No. 2607.

Circuit Court of Appeals, First Circuit.

March 18, 1932.

Charles H. Eden, Asst. U. S. Atty., of Providence, R. I. (Henry M. Boss, Jr., U. S. Atty., of Providence, R. I., on the brief), for the United States.

Joseph E. Fitzpatrick, of Providence, R. I. (Mortimer W. Newton, of Providence, R. I., on the brief), for appellee.

Before BINGHAM and WILSON, Circuit Judges, and BREWSTER, District Judge.

BINGHAM, Circuit Judge.

For the purpose of this appeal, two causes tried in the federal District Court for Rhode Island were consolidated. The first is a libel brought by the United States against the British motor vessel Mazel Tov, to effect the collection of certain penalties assessed against the master for violations of the revenue laws of the United States. Their assessment and collection are based on the following grounds: (1) For failure to produce a manifest of the cargo; (2) for having on

board merchandise not described in the manifest; and (3) for having arrived within the limits of collection district No. 4 (Massachusetts) and attempting to depart therefrom without making entry. The first two grounds are alleged to be violations of section 584 of the Tariff Act of 1930 (19 USCA § 1584), and the third a violation of section 585 of that act (19 USCA § 1585).

The second is a libel seeking the forfeiture of the cargo (403 sacks and 6 bottles of distilled spirits) valued at $14,286.18, on the ground that it was found on board a vessel bound for the United States, within four leagues of the shore, consigned to the master of the vessel, and was not included or described in the manifest, in violation of section 584 of the Tariff Act.

The libel, seeking collection of penalties out of the vessel, was dismissed, and the vessel ordered returned to its owners or their agent. The libel for the forfeiture of the cargo was also dismissed, and the cargo ordered placed upon the vessel in the custody of its owners or their agent; and, decrees of dismissal having been entered in each case, appeals were taken to this court.

In the District Court it was found that, on the evening of November 1, 1930, at about five minutes after 6, the Mazel Tov was boarded by officers of the Coast Guard on the destroyer Tucker when eleven and one-half miles distant from the nearest point of land off the coast of Massachusetts. When the Mazel Tov was first seen, she was under way and headed for Gay Head, the southwesterly point of Martha's Vineyard. Having apparently observed the approach of the Tucker, she changed her course to sea, but, on being overtaken, promptly stopped when signaled so to do. An officer of the Tucker upon boarding the Mazel Tov demanded her manifest, which the court below found was produced. A search of the vessel, thereafter made, disclosed that her sole cargo, outside of sea stores, consisted of 403 sacks and a few bottles of whisky, cleared at St. Pierre on October 16, 1930, which were not included or described in her manifest; and, while the cargo was about one-fourth the quantity which the vessel could carry, it was specifically found that the Mazel Tov had, at no time, been within three miles of the United States nor within the limits of the United States; that she sailed from a foreign port, and that it was intended that the liquors on board her should be transhipped to contact boats and landed in the United States; that the speed of the Mazel Tov was between nine and ten

knots an hour and insufficient for her to reach the shore of the United States in an hour's time; that the value of the liquor was $14,-286.18; and that notice of the penalties, assessed by the administrative officer of the customs, and the form thereof, notifying the master of their assessment, in the sums of $500, $5,000, and $14,236.19, were sufficient, and that the assessments had not been paid.

The penalty of $500 assessed against the master for not producing a manifest was denied, on the ground that the paper produced on the demand of the Coast Guard officer was a manifest within the meaning of section 584.

The penalty of $14,286.18, for having on board the vessel merchandise not included or described in the manifest was denied on the ground that the seizure was made beyond the three-mile limit and not within an hour's run of the vessel to the nearest shore, as prescribed in the Treaty between the United States and Great Britain of May 22, 1924 (43 Stat. 1761); in other words, that in so far as the provisions of section 581 of the Tariff or Customs Act of 1922 (19 USCA § 481) re-enacted in 1930 (19 USCA § 1581), fixed the distance (four leagues or twelve miles) from the shore within which a vessel bound for the United States may be boarded, and, if found to be violating the revenue laws of the United States, may be seized, they had been abrogated as to intoxicating liquors.

As to the penalty of $5,000, for departing or attempting to depart from a "collection district" in violation of the provisions of section 585, it was held that the vessel was not liable for the reason that, at the time the Mazel Tov was signaled to stop, she had not arrived within the limits of any collection district; that a collection district does not extend out to sea for a greater distance than three miles from shore.

The only errors assigned and here relied on, as to the libel asserting penalties against the vessel, are: (1) Whether the treaty of May 22, 1924, changed or amended the four-league limit fixed in the various provisions of our revenue laws and, in particular, as fixed in section 581 of the Tariff Act of 1922 (19 USCA § 481), or has or was intended to have any application to the situations provided for and governed by those provisions; and (2) if the treaty did not amend section 581 in the particular above specified, whether, under the evidence and facts found, the vessel, when she came within four leagues or twelve miles of the shore, was bound for the United States so that the provisions of sections 581 and 584 became applicable and subjected her to sei-

zure and to the collection of the penalties assessed against her master.

The only penalties, as to which any contention is made before us on this appeal, are those for $14,286.18, the value of the merchandise, and for $5,000 for departing from a collection district without entry.

█ The first question is whether the Treaty of May 22, 1924, amended that clause of section 581 of the Tariff Act of 1922, fixing a coast line four leagues from our shore as the bound with respect to which any vessel coming within the same should, if requested, produce a manifest or be subject to the penalties prescribed in section 584, which provisions Congress has made for the protection of our commerce and the enforcement of our customs-revenue laws.

As to this we are of the opinion that the District Court was in error; that the high contracting parties, in making the Treaty of May 22, 1924, did not intend to alter and did not thereby effect a change in the customs-revenue laws of the United States, wherein Congress had fixed a four-league protective zone. At the time the treaty was made, the Eighteenth Amendment to the Constitution was in force and the National Prohibition Act was in existence, having been enacted by Congress in 1919. By both the amendment and the National Prohibition Act the importation of intoxicating liquors into the United States and all territory subject to its jurisdiction was prohibited.

The Eighteenth Amendment (40 Stat. 1050), in section 1, provided:

"Section 1. After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited."

And section 3, title 2, of the National Prohibition Act (41 Stat. 305 [27 USCA § 12]), provided:

"Sec. 3. No person shall [on or after the date when the eighteeenth amendment to the Constitution of the United States goes into effect,] manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor except as authorized in this Act, and all the provisions of this Act shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented."

November 23, 1921, Congress passed an act supplemental to the National Prohibition Act (42 Stat. 222) and in section 3 thereof defined the territorial field to which the act applied, as follows:

"Sec. 3. That this Act and the National Prohibition Act shall apply not only to the United States but to all territory subject to its jurisdiction. * * * " 27 USCA § 2.

And the Supreme Court in Cunard S. S. Co. v. Mellon, 262 U. S. 100, 120–122, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306, prior to making the treaty, had held that the term "importation" as employed both in the Eighteenth Amendment and in the National Prohibition Act had a broader meaning than in the customs-revenue laws; that under the former the bringing of intoxicating liquors for beverage purposes within the three-mile limit, though without intending to land, was forbidden importation, although under the customs-revenue laws the bringing of such intoxicating liquors within the three-mile lim it without intending to land was not a forbidden importation. See, also, Alksne v. United States (C. C. A.) 39 F.(2d) 62, 67, 68.

And in construing the meaning of the word "territory" (page 122 of 262 U. S., 43 S. Ct. 504, 507) as used in the Eighteenth Amendment, in the phrase "the United States and all territory subject to the jurisdiction thereof," the court had held that it meant "the regional areas—of land and adjacent waters—over which the United States claims and exercises dominion and control as a sovereign power"; that "the immediate context and the purport of the entire section show that the term is used in a physical and not a metaphorical sense—that it refers to areas or districts having fixity of location and recognized boundaries. See United States v. Bevans, 3 Wheat. 336, 390, 4 L. Ed. 404"; and that the term "territory" as used in the supplemental act, above quoted, means "that its field coincides with that of the Eighteenth Amendment" (page 127 of 262 U. S., 43 S. Ct. 504, 509).

In explaining the extent or boundaries of the regional areas of land and water over which the United States claims and exercises dominion and control as a sovereign power (page 122 of 262 U. S., 43 S. Ct. 504, 507), it said:

"It now is settled in the United States and recognized elsewhere that the territory subject to its jurisdiction includes the land areas under its dominion and control, the ports, harbors, bays and other enclosed arms of the sea along its coast and a marginal belt

of the sea extending from the coast line outward a marine league, or three geographic miles."

Then again, in speaking of the applicability of the National Prohibition Act and the above-quoted supplemental provision, with reference to domestic and foreign vessels when within or without the waters extending outward three miles from the coast line (page 127 of 262 U. S., 43 S. Ct. 504, 509), it said:

"There is in the act no provision making it applicable to domestic merchant ships when outside the waters of the United States, nor any provision making it inapplicable to merchant ships, either domestic or foreign, when within those waters, save in the Panama Canal."

And, in concluding its discussion as to the territorial applicability of the act (pages 128, 129 of 262 U. S., 43 S. Ct. 504, 509), it said:

"Examining the act as a whole, we think it shows very plainly, first, that it is intended to be operative throughout the territorial limits of the United States, with the single exception stated in the Canal Zone provision; secondly, that it is not intended to apply to domestic vessels when outside the territorial waters of the United States; and, thirdly, that it is intended to apply to all merchant vessels, whether foreign or domestic, when within those waters, save as the Panama Canal Zone exception provides otherwise.

"In so saying we do not mean to imply that Congress is without power to regulate the conduct of domestic merchant ships when on the high seas, or to exert such control over them when in foreign waters as may be affirmatively or tacitly permitted by the territorial sovereign; for it long has been settled that Congress does have such power over them. Lord v. Steamship Co., 102 U. S. 541, 26 L. Ed. 224; The Abby Dodge [v. U. S.] 223 U. S. 166, 176, 32 S. Ct. 310, 56 L. Ed. 390. But we do mean that the National Prohibition Act discloses that it is intended only to enforce the Eighteenth Amendment and limits its field of operation, like that of the amendment, to the territorial limits of the United States."

A further question was involved in Cunard S. S. Co. v. Mellon. It there appears that foreign ships from an early day had exercised "the practice of carrying intoxicating liquors for beverage purposes as part of a ship's sea stores," and the steamship company made the contention that neither the amendment nor the act itself could have been intended to disturb that practice within our territorial waters and ports. But the court held that "the avowed and obvious purpose of both the amendment and the act was to put an end to prior practices respecting such liquors, even though the practices had the sanction of antiquity, generality and statutory recognition."

This decision was rendered April 30, 1923. It brought to light an apparent lack of unchallenged power on the part of the United States to search and seize foreign vessels outside the three-mile limit, in the enforcement of the Eighteenth Amendment and the National Prohibition Act, in so far as they prohibited the importation of intoxicating liquor into its territorial waters, within one league of its coast.

It also made clear the inability of British vessels, if the Prohibition Act was to be enforced, to bring liquors that were sea stores within our territorial waters and ports.

With these difficulties confronting the two nations, they negotiated the Treaty of May 22, 1924, in which, in article 1 (43 Stat. 1761), they reaffirmed what had previously been the universal understanding (Cunard S. S. Co. v. Mellon, 262 U. S. 122, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306) that "3 marine miles extending from the coastline outwards and measured from low-water mark constitute the proper limits of territorial waters."

It is apparent that this provision of article 1 did not settle the difficulties which brought the high contracting parties together. But in article 2 provisions were inserted authorizing the United States to exercise powers, without objection, which theretofore the British government had questioned.

In subdivision 1 of that article "His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of territorial waters by the authorities of the United States, * * * in order that enquiries may be addressed to those on board and an examination be made of the ship's papers for the purpose of ascertaining whether the vessel or those on board are endeavoring to import or have imported alcoholic beverages into the United States, * * * in violation of the laws there in force," etc.

The more important clause, as concerned the United States, is found in subdivision 2 of that article, which provides:

"If there is reasonable cause for belief that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States,

* * * prohibiting the importation of alcoholic beverages, the vessel may be seized and taken into a port of the United States, * ᵗ * for adjudication in accordance with such laws."

The only substantial limitation on the exercise of the right of visitation, search, and seizure, given or recognized in these subdivisions of article 2, is contained in subdivision 3, which provides that they "shall not be exercised at a greater distance from the coast of the United States * * * than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense," or where "the liquor is intended to be conveyed to the United States * * * by a vessel other than the one boarded and searched, it shall be the speed of such other vessel and not the speed of the vessel boarded, which shall determine the distance from the coast at which the right under this article can be exercised."

It is apparent from the situation confronting the contracting parties and from these provisions of article 2 that the United States was contracting for and obtaining the privilege or right, without objection on the part of the British government, of boarding and examining British vessels outside the three-mile limit for the purpose of ascertaining whether such vessels or those on board had imported, were importing, or were attempting to import alcoholic beverages into the United States in violation of its laws prohibiting the importation of alcoholic liquors, and that, if it found reasonable cause to believe that the vessel or those on board had committed or were committing or attempting to commit an offense against such laws, it could seize the vessel and have the same adjudicated and forfeited in accordance with those laws.

There is nothing in article 2 or its subdivisions showing that the United States was undertaking to acquire any right or privilege as to the enforcement of its customs-revenue laws as exemplified in sections 581 and 584 of the Tariff Act of 1922 (19 USCA §§ 481, 486) which are the same as the like numbered sections in the Tariff Act of 1930 (19 USCA §§ 1581, 1584) and contain provisions such as have been a part of every Tariff Act passed by Congress beginning with the Act of 1790 (1 Stat. 145), which introduced the four-league limit (section 31, p. 164) of the British hovering statutes. See 9 George 2d, C. A. P. 35 (1736); Arch v. United States (C. C. A.) 13 F.(2d) 382. Neither the Tariff Act of 1922 nor of 1930 prohibits the importation of alcoholic beverages. Sections 581 and 584 clearly do not prohibit their importation, and consequently it cannot reasonably be said that the high contracting parties in article 2 of the treaty were undertaking to or did there stipulate with reference to our customs-revenue laws, and particularly sections 581 and 584 containing provisions which had been embraced in the customs-revenue statutes of this government since its foundation and which did not prohibit importation of alcoholic liquors. Gillam v. United States (C. C. A.) 27 F.(2d) 296, 300, 301; Miller v. United States (D. C.) 49 F.(2d) 368, 369, certiorari denied in 283 U. S. 866, 51 S. Ct. 657, 75 L. Ed. 1470.

The fact that Congress in 1930 re-enacted sections 581 and 586 (19 USCA §§ 1581, 1586) of the Tariff Act of 1922, without change, each of which sections contained the "four leagues of the coast" provision, is practically conclusive evidence that Congress did not regard or understand that these sections of the act of 1922 were amended by the treaty.

■ Having reached the conclusion that the treaty of 1924 did not repeal or abrogate the clause fixing a four-league zone in our customs-revenue laws (including section 581), the next question is whether the Mazel Tov may be charged with the payment of the penalty of $14,286.18 assessed against the master for having on board merchandise not included or described in the vessel's manifest.

The Tariff Acts of 1922 and 1930, in section 584 (19 USCA §§ 486, 1584) provide:

"Any master of any vessel * * * bound to the United States who does not produce the manifest to the officer demanding the same shall be liable to a penalty of $500, and if any merchandise, including sea stores, is found on board of or after having been unladen from such vessel * * * which is not included or described in said manifest or does not agree therewith, the master of such vessel * ʸ * shall be liable to a penalty equal to the value of the merchandise so found or unladen, and any such merchandise belonging or consigned to the master or other officer or to any of the crew of such vessel * * * shall be subject to forfeiture, and if any merchandise described in such manifest is not found on board the vessel ʸ * * the master * ʸ. * shall be subject to a penalty of $500;" etc.

And section 594 of those acts (19 USCA §§ 498, 1594) provides:

"Whenever a vessel * * *, or master * * * has become subject to a penalty for

violation of the customs-revenue laws of the United States, such vessel * * * shall be held for the payment of such penalty and may be seized and proceeded against summarily by libel to recover the same;" etc.

In the District Court, as above pointed out, the penalty in question was denied, not on the ground that the vessel was not subject to the penalty, in case the provisions of sections 581 and 584 of the act of 1922 were not amended by the treaty of 1924, but solely on the ground that they were so amended and Congress by re-enacting these sections in the act of 1930 did not intend to alter the treaty. We think that all the facts essential to the assessment of the penalty of $14,286.18 against the master under section 584, and its collection out of the vessel under section 594, have been found by the court below, unless it be the fact whether the vessel, when it came within four leagues of our shore, was bound for the United States. This matter the District Court either regarded as covered by his findings, or inadvertently overlooked. He specifically found that the vessel sailed from St. Pierre, a foreign port; that it was intended that the liquors on board her should be transhipped to contact boats and landed in the United States; that when hailed and boarded she was less than four leagues from the nearest shore; and that the liquors were not included in her manifest. And the evidence further shows that, when the Mazel Tov was first seen, she was 100 miles or so off her course to Nassau; that some fifteen days had expired since she left St. Pierre; that she was then less than four leagues from shore, was under way headed for Gay Head, the southwesterly point of Martha's Vineyard, at night and without lights. Upon this showing we conclude that she was in fact and in law bound for the United States within section 584 [The Marion Phillis, 36 F.(2d) 688 (C. C. A. 2d Cir.); The Newton Bay, 36 F.(2d) 729, 731 (C. C. A. 2d Cir.); Miller v. United States, 49 F.(2d) 368, 369 (C. C. A. 4th Cir.)], and that the District Court erred in not holding that the seizure of the vessel was lawful and that she was subject to having the penalty assessed against the master collected out of her.

The conclusion of the District Court that the vessel could not be held for the payment of the penalty of $5,000 assessed against the master for the alleged violation of section 585 we think was right; for, on the facts found, the Mazel Tov did not enter or arrive within the limits of the Massachusetts collection district or any other collection district of the United States. In the opinion of that court it is clearly pointed out that the collection district of Massachusetts only extends out three miles from the shore of that state, not to a point four leagues from shore.

A contrary view was taken by the Circuit Court of Appeals for the Fourth Circuit in Miller v. United States, 49 F.(2d) 368, and in support of its position it cited two cases, Harrison v. Vose, 9 How. 372, 380, 13 L. Ed. 179 and The Cherie (C. C. A.) 13 F.(2d) 992. The latter case arose in this circuit. The provision of the Tariff Act which we there had under consideration was section 586, not section 585, which was the one involved in the Miller Case, and is here. Section 586 authorizes the exercise of certain power or authority after the vessel's "arrival within four leagues of the coast of the United States." That provision is not contained in section 585. The exercise of the power authorized by section 585 is when the vessel "arrives within the limits of any collection district and departs or attempts to depart," etc. It is reasonable to suppose that Congress, in using the term "collection district" in section 585, did not intend that it should extend beyond the territorial jurisdiction of the United States, which the Supreme Court clearly points out in Cunard S. S. Co. v. Mellon does not extend beyond three miles from the shore, and that, in using the different terms in the two sections, they did so advisedly, and as meaning different areas. If the terms mean substantially the same, as contended by the government, it is strange that Congress did not use the same phrase in sections 585, 586 and 581. However, our decision in The Cherie does not sustain the position taken by the Fourth circuit as to this question; and we fail to see what bearing the other case cited (Harrison v. Vose) has to do with it. The court there did not have under consideration what the term "collection district" meant, and manifestly did not hold that a collection district extended out four leagues from the shore.

The only remaining question relates to the forfeiture of the cargo on the ground that it was found on board the vessel bound for the United States, within four leagues of the shore, consigned to the master of the vessel and not included or described in the manifest as required by section 584. The master, in his claim and answer to the libel, sets himself up as the consignee and claimant of the cargo of liquors, thereby admitting that the cargo was consigned to him. This fact and the other facts specifically found by the District Court fulfill all the requirements for an

adjudication forfeiting the liquors under section 584. Apparently the only reason for a contrary holding in the District Court as to this was that this section was amended by the treaty of 1924. There could have been no other reason for dismissing this libel and not ordering a forfeiture of the liquors.

The decrees of the District Court dismissing the libels are vacated, and the cases are remanded to that court for further proceedings not inconsistent with this opinion.