### UNITED STATES v. POWERS et al.
### No. 32314.

District Court, E. D. New York.

Oct. 28, 1932.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Alfred C. McKenzie, Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for the United States.

Louis Halle, of New York City (Milton R. Kroopf, of New York City, of counsel), for defendants.

BYERS, District Judge.

This is a motion for an order suppressing the evidence said to have been obtained by the Federal authorities as a result of an unlawful search and seizure.

The motion was noticed for September 26, 1932, and argued October 19th.

The facts as disclosed in the affidavits are as follows:

The Coast Guard Patrol Boat No. 168, operating from Base Two, Staten Island, New York, proceeded therefrom on May 14, 1932, for a three day patrol in the eastern end of Long Island Sound. The Chief Boatswain's Mate in charge was instructed by the commanding officer of Base Two "to look out for the American Oil Screw 'Elizabeth S,' which vessel was suspected of smuggling rum." At that time there had been a number of fishing vessels of a similar construction to the "Elizabeth S" used in the smuggling of intoxicating liquors into this Customs Collection District, the said fishing vessels having double bottoms for the purpose of concealing contraband, and a number of them had been seized.

On May 16, 1932, at two o'clock in the afternoon, the No. 168 sighted the "Elizabeth S" at a point said to have been about half way between Six Mile Reef and Hortons Point, at the easterly end of Long Island Sound.

As the No. 168 drew alongside, the Boatswain's Mate in command says that he noticed that the water-line of the "Elizabeth S" on the starboard side was below the surface of the water. Then the latter vessel was boarded and the master was interviewed, and asked to produce the ship's papers and documents, which he did. No deficiencies were observed, and, in reply to a question, the master stated that he had nothing on board except ice in the fish bins, and that the "Elizabeth S" had left New Bedford bound for Bridgeport, Conn. The master was asked if the boarding officer could go below into the hold and look the vessel over; the officer was invited to "go ahead." A measurement taken below decks indicated that the hold was 5 feet deep, while the ship's papers indicated a depth of 7.1 feet. The free-board was measured, but the place at which the measurement was taken is not stated. The free-board as measured was found to be 3 feet, and the affidavit continues: "which meant that the bottom of the hold was two feet below the water level." The master was asked the draft of the ves-

sel and he replied: "Seven feet, two feet of which was the keelson."

The boarding officer avers that this indicated to him that there were three feet of space unaccounted for. Inquiry on this subject resulted in the master's stating that, so far as he knew, there was no such space.

The boarding officer left, and avers that his supicions by this time had been aroused, inasmuch as the vessel was not in the usual course from New Bedford to Bridgeport, and because of the discrepancy said to have been indicated by the measurements. Before leaving, the boarding officer searched the vessel to find an entrance into this alleged three-foot space, having first asked if there was an entrance into the bilges and having been informed that there was none.

These transactions are said to have occupied about three hours, and the boarding officer is said to have told the master of the "Elizabeth S" to continue on its course, and that the No. 168 would trail. Apparently this was done, and, after an interval said to have been of two hours' duration, the commanding officer of the No. 168 again boarded the "Elizabeth S," seeking an entrance to the bilges, and, upon being referred to a hatch underneath the table in the forecastle, a search for that hatch was made without result. The boarding officer's statement continues: "Deponent, however, noticed two screws in the collar at the base of the mast in the forecastle. Deponent removed the collar and lifted up two unevenly cut boards, which resembled a hatch, and underneath found that the mast was stepped in a square piece of hard wood, two feet by two feet, and about three and a half inches thick. I felt around this square base and found in back an opening about two feet long and about one and a half inches wide. In this space deponent was able to feel material which felt like burlap bags. Deponent then drove a screw-driver through this opening and felt the screw-driver strike glass. Deponent then ripped the burlap and with a flashlight was able to discern a bottle containing a liquid. Deponent then asked the master whether he had a manifest for this cargo, and the master said, 'No.' Deponent then directed the #168 to draw alongside, and also informed the master and his crew who are the above named defendants that they were under arrest, and that the 'Elizabeth S' was under seizure. Deponent placed the prisoners on board the #168 under guard. This point of arrest and seizure was approximately seven miles south southwest of Faulkner's Island, within the Eastern District of New York, and within this jurisdiction."

The master of the "Elizabeth S" avers that the boarding officers were equipped with iron crowbars and axes, which they used on their second boarding, and commenced to rip up the floor in the forecastle, and to chop wood away from the base of the mast. He says that there was no consent given to the said search or seizure, nor to the boarding of the vessel, and the motion has been argued on the theory that that statement is true.

The Government asserts two propositions:

(1) That the Coast Guard had the right to stop and search this vessel within the twelve-mile limit without probable cause, and, if the search revealed that any law of the United States had been violated, the vessel might properly and legally be seized and the crew arrested.

(2) That, even if probable cause was prerequisite to the stopping of the "Elizabeth S" and the search, such probable cause existed in this case.

As to the second contention, it may be observed that "probable cause," as defined in Carroll et al. v. United States, 267 U. S. 132, at page 149, 45 S. Ct. 280, 284, 69 L. Ed. 543, 39 A. L. R. 790, is " * * * a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction * * * ".

The only circumstance recited in the affidavit of the boarding officer, as meeting the foregoing test, is that the "Elizabeth S" seemed to be loaded below her water-line.

On the argument it was conceded that there are no regulations establishing the water-line of coastal vessels. Therefore the water-line of such craft is not to be confused with the load line requirements which have to do with cargo-carrying vessels. The mere fact that a fishing boat appears to be loaded a few inches below her apparent water-line is not in itself a suspicious circumstance, nor does it constitute probable cause to believe that the cargo is contraband.

It is also contended that the fact that this boat was out of her course from New Bedford to Bridgeport, constituted a probable cause within the test above quoted, but the mere statement of that contention suggests the answer. A vessel may go out of her course to take supplies or to avoid the

force of an adverse wind, or for any number of practical reasons.

Nothing is shown in this case to bring the "Elizabeth S" within the decision of United States v. Hayes et al. (D. C.) 52 F.(2d) 977. At page 979 of 52 F.(2d), Judge Sheppard recited the facts which constituted the probable cause, and nothing corresponding thereto is here present.

The Government's first contention is not supported by any decision cited in its brief, nor has a careful search brought any to light. Reliance is placed upon the provision of the Tariff Law of 1930 found in title IV, § 581 (title 19, U. S. C., § 1581 [19 USCA § 1581]), which confers, upon officers of the Customs and of the Coast Guard, the right to board vessels. The history and scope of this statute are discussed in Maul v. United States, 274 U. S. 501, 47 S. Ct. 735, 71 L. Ed. 1171.

The opinion in United States v. Hayes, supra, contains the following: "'Probable cause' was not a prerequisite for authority of the Coast Guard patrol to board the vessel [under this statute] to inspect for any violation of the navigation, tariff, or other laws of the United States; but the facts indicate that the officers of the 'Cummings' suspected the yacht had a cargo of intoxicating liquor and assumed that 'probable cause' was requisite to justify boarding, inspection, and examination. If that were the distinct purpose, it may be that a showing of 'probable cause' was a prerequisite under the provisions of the Prohibition Act for a search for intoxicating liquor. Assuming, but not deciding, that search for this purpose under the circumstances disclosed must be predicated on 'probable cause,' the material facts, as to which there is no serious conflict, may be summarized."

Then follows a recital of the facts which, in the Court's opinion, constituted probable cause.

The refusal of the Court, in the Hayes Case, to dispose of that motion on the ground that the Coast Guard had the right to board and search the "Cummings," in the absence of probable cause, left the question open for determination in appropriate circumstances; such are thought to be presented by this record.

Nothing has been decided since the Hayes Case which fortifies the position which the Government seeks to have the Court take in this case, and the reason why there should be probable cause as the prerequisite to justify boarding for the purpose of detecting a violation of the Prohibition Law only, is clearly revealed in the case of Fish v. Brophy (D. C.) 52 F.(2d) 198, decided by Judge Knox in the Southern District of New York, in which a pleasure craft, absolutely devoid of any contraband, was boarded by the Coast Guard in the asserted possession of the authority so to do, even without probable cause.

The boarding officer of the No. 168, purporting to act, as it is now argued, under section 581 of the Tariff Act of 1930, boarded the "Elizabeth S," but brought to light no violation of law, because he left the vessel and told her master to proceed on his course, instead of seizing the vessel or arresting any person on board. This conduct shows that he did not board the "Elizabeth S" having in mind any violation of the Customs or Shipping Law. His purpose was to discover, if possible, a violation of the Prohibition Law, and this decision is based upon the ground assumed but not decided in the case of United States v. Hayes, supra; namely, that the officers of the No. 168, if they suspected that the "Elizabeth S" had a cargo of intoxicating liquors, and that was the only excuse for their actions, could not board the "Elizabeth S" in the absence of probable cause, and that no probable cause has been shown.

This result accords with the decision in the case of United States of America v. James Coppolo, Nick Olson and Arthur Hanson, 2 F. Supp. 115, decided by Judge Avis in the United States District Court for the District of New Jersey, whose opinion, filed June 27, 1932, has been read with much interest.

Motion granted. Settle order on two days' notice.